JESSICA SCHAUBHUT CORTEZ, ET AL

VERSUS

MARY A. SCHAUBHUT

NO. 20-CA-371

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-NINTH JUDICIAL DISTRICT COURT
PARISH OF ST. CHARLES, STATE OF LOUISIANA
NO. 86,761, DIVISION "E"
HONORABLE TIMOTHY S. MARCEL, JUDGE PRESIDING

July 21, 2021

**FREDERICKA HOMBERG WICKER**
**JUDGE**

Panel composed of Judges Fredericka Homberg Wicker,
Robert A. Chaisson, and John J. Molaison, Jr.

**REVERSED IN PART AND REMANDED TO AMEND JUDGMENT AS**
**INSTRUCTED**
 **FHW**
 **RAC**
 **JJM**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Jalisa Walker
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
JESSICA SCHAUBHUT CORTEZ, PAM SCHAUBHUT PLAISANCE,
BARBARA FOLSE, MICHAEL FOLSE, RICHARD FOLSE, AND JESSE
FOLSE
    Louis G. Authement

COUNSEL FOR INTERVENOR/APPELLANT,
JOHN SCHAUBHUT
    Russell C. Monroe

**WICKER, J.**

This appeal arises out of a property dispute. The plaintiffs in the underlying suit filed a petition for partition against a relative, Mary A. Schaubhut, hoping to subdivide a piece of immovable property, referred to by the parties as the "waterfront property."[1] Intervenor-Appellant, John J. Schaubhut ("Uncle John"[2]) disputed the claims of ownership over only a portion of the waterfront property contiguous to his individually owned property and home, asserting his own claims of ownership through title and acquisitive prescription.[3]

At the conclusion of trial, the trial court rendered a judgment, dismissing Uncle John's intervention suit with prejudice. Uncle John now appeals the trial court's July 17, 2020 judgment dismissing his claims of ownership over the disputed property by title and by acquisitive prescription. For reasons stated more fully below, we reverse in part the trial court's July 17, 2020 judgment, finding that Uncle John acquired the property in dispute through thirty-year acquisitive prescription. We remand this matter for the trial court to amend the judgment to specify that Uncle John is the owner of the property at issue, a strip of land contiguous to his property and in front of his residence, through acquisitive prescription of thirty years and that the boundary to his property is set along the public road. We further instruct the trial court to amend the judgment as it relates to the enforcement of the appellees' voluntary settlement insofar as it infringes upon Uncle John's property.

## FACTUAL BACKGROUND & CHAIN OF TITLE

This matter involves a dispute over the ownership of a strip of land included within the waterfront property located between property owned by Uncle John and

---

[1] The plaintiffs and defendant in the underlying partition action collectively constitute the Appellees/Defendants-in-Intervention.

[2] As both parties, and all witnesses at trial, refer to Intervenor-Appellant as "Uncle John," this Court will also do so throughout this Opinion.

[3] See Appendix 1. The highlighted property collectively represents the waterfront property; the land specifically highlighted in green represents the portion of the waterfront property over which Uncle John asserts ownership. The non-highlighted strip of land with angled markings, located between the highlighted portions of land (the waterfront property), is referred to throughout the record as "Down the Bayou Road."

a public road.[4]  The waterfront property, in its entirety, consists of three narrow tracts of land on either side of the public road running adjacent to Bayou des Allemands, "Down the Bayou Road."  Historically, the property formed a portion of Lot 156 of the Coteau de France in St. Charles Parish, Louisiana.

The parties agree their respective chains of title trace back to one common ancestor in title, Mrs. Angelique Somme Schaubhut, who acquired ownership of Lot 156 of the Coteau de France pursuant to a February 6, 1869 plan of division.  Upon her death, ownership of Lot 156 passed to Angelique's four children: Arthur Schaubhut, Pauline Schaubhut, Edward Schaubhut, and William ("Willie") Schaubhut.  Because Arthur predeceased Angelique, his seven children inherited on his behalf.  Arthur's children include: Elywn, Merlin, Vivian, Rita, Lillian, Arthur Jr., and Uncle John.

On June 2, 1958, Angelique's three children and seven grandchildren partitioned Lot 156 into four lots, "A," "B," "C," and "D."  Arthur's children, including Uncle John, inherited Lot A.[5]  The 1958 act of partition legally describes Lot A in the following manner:

> A certain lot or portion of ground being a part of a tract of land…referred to as Lot 'A'—allotted [sic] to A. Schaubhut, et al, on the subdivision of portion of Lot 156 of the 'Coteau De France'…by plan of E.M. Collier, dated May 23, 1958…and according to said plan Lot 'A' commences at the intersection of the Southern line of Lot 156 with the public road running along Bayou des Allemands, thence runs N17-09W for a distance along said road of 83.98 feet, thence S89-26E for a distance of 503 feet, thence S17-09E for a distance of 83.98 feet, thence S89-26E for a distance of 503 feet, to the point of beginning.[6]

Attached to the 1958 act of partition is a survey dated May 23, 1958, which shows Lot A directly abutting a fifty-foot-wide public road, Down the Bayou Road, that borders on the water's edge of the Bayou des Allemands.  Behind Lot A, closer

---

[4] See Appendix 1.
[5] Willie inherited Lot B, Pauline inherited Lot C, and Edward inherited Lot D.
[6] It appears the lot description mistakenly provides the compass direction as "S89-26E" but should read as "N89-26W."

to the Grand Marais, sat Lot C, which commenced at the Southeast boundary of Lot A. Lots B and D sat parallel to Lots A and C respectively, separated by a strip of land—twenty feet in width and 1006 feet in length (running "the full depth of Lot 156"). The 1958 act of partition formally dedicated for public use the twenty-foot strip of land, which is referred to as Schaubhut Lane. The survey additionally shows two tracts of land approximately 300 to 400 feet in length, behind Lots C and D on either side of Schaubhut Lane, which were not subdivided in the 1958 act of partition. The 1958 act of partition and attached survey were duly recorded in the St. Charles Parish public records at COB 21, folio 283.

On July 24, 1959, Arthur's seven children partitioned Lot A into seven parts. Uncle John acquired Lot A-7. The 1959 act of partition states:

> Lot A-7 commences at the intersection of the South line of Lot 156 with the public road running along Bayou Des Allemands, thence runs N17-09W for a distance along said road of 83.98 feet, thence S89-26E for a distance of 71.86 feet, thence S17-09E for a distance of 83.98 feet, thence S89-26W for a distance of 71.86 feet to the point of beginning.[7]

Lots A-6 through A-1 were successively identified in reverse chronological order, with each lot commencing at the northeast corner of the previously identified lot and having the dimensions of 71.86 feet in length and 83.93 feet in width; the eastern boundary of A-1 abuts the western boundary of Lot C. Attached to the 1959 act of partition is a survey dated June 15, 1958, which shows Lot A-7 directly abutting a fifty-foot-wide public road that borders on the water's edge of the Bayou des Allemands. The survey further designates the two additional tracts of land behind Lots C and D, which were not previously subdivided, as Lots E and F, respectively.[8]

Subsequently, on April 18, 1960, Angelique's three children and seven grandchildren took part in an act of sale. Specifically, Elywn, Merlin, Vivian, Rita,

---

[7] It appears the lot description mistakenly provides the compass direction as "S89-26E" but should read as "N89-26W."
[8] See Appendix 2.

Lillian, Arthur Jr., Uncle John, Pauline and Edward sold to Willie all of their rights, titles, and interests in Lot 156, except for their designated lots in the 1958 act of partition, as follows:

> All their rights, titles, and interests in and to the…portion of ground known as 'The Coteau de France,'…per plan of division made…on the 6th day of February, 1869…designated by the Number One Hundred and Fifty-six (156) on said plan and measures One arpent in front of Bayou des Allemands by the following depth, viz: Lot 156 measures 1401 feet, more or less…extending from Bayou des Allemands to the Grand Marais as per plan and according to survey of E.M. Collier, Surveyor, dated May 23, 1958…

> LESS AND EXCEPT lots of ground allotted to Elywn G. Schaubhut, et als, William A. [Willie] Schaubhut, Pauline Schaubhut Champagne and Edward J. Schaubhut in act of partition between Elywn G. Schaubhut, et als, dated June 2, 1958 and duly recorded in COB 21, folio 283.

In 1964, Willie passed away. Willie died intestate and was survived by his wife and five children: Johnny, Jimmy, Diana, Lloyd, and Mary. Mary, the defendant in the underlying partition suit, is Willie's only surviving child. This boundary issue did not arise until decades later when Willie's descendants instituted an action for partition to subdivide the waterfront property into five lots.

## PROCEDURAL HISTORY

On August 20, 2019, Willie's descendants—Jessica Schaubhut Cortez, Rita Naquin Schaubhut, Barbara Folse, Michael Folse, Richard Folse, and Jessie Folse— the plaintiffs in the underlying matter, instituted an action against Mary, Willie's daughter, for the partition of the waterfront property in its entirety.[9] Mary filed an answer of general denial and raised two affirmative defenses, alleging that the landowners of Lots A-7 and 1-B, namely Uncle John and Mary's daughter, Faith Frickey, owned the waterfront property through acquisitive prescription. Uncle John filed a petition for intervention[10] asserting ownership by title and, in the alternative,

---

[9] As previously indicated, Willie's descendants—Jessica Schaubhut Cortez, Barbara Folse, Michael Folse, Richard Folse, Jessie Folse, Mary A. Schaubhut, and Pam Schaubhut Plaisance, on behalf of her mother Rita Naquin Schaubhut—collectively constitute the appellees in the instant case.

[10] On January 16, 2020, Uncle John filed a Motion for Leave to File Petition for Intervention pursuant to La. C.C.P. art. 1091. On February 27, 2020, a hearing was held and Uncle John's motion was granted. On March 13, 2020, Uncle John filed a petition for intervention, which was amended shortly thereafter on

by acquisitive prescription over that portion of the waterfront property contiguous with Lot A-7.[11]

A two-day bench trial was held on the underlying partition suit and Uncle John's petition for intervention.[12]  At trial, the plaintiffs called Mr. Stephen Flynn, an expert witness in the field of land survey.  Mr. Flynn testified that he worked for Riverlands Surveying Company ("Riverlands"), and that Jessica Schaubhut Cortez—Johnny's daughter and Willie's great-granddaughter—retained him to survey Lot 156 of the Coteau de France in 2017.[13]  When conducting surveying services for a client, Mr. Flynn's first goal is to get an understanding of the general area and surrounding properties.  In the instant case, Mr. Flynn conducted an inter-office records search across the records of three different surveyors and land companies, and did "some" public records research.  This search included reviewing the prior acts of partition, the act of sale, and prior surveys.

Mr. Flynn confirmed that the June 2, 1958 act of partition divided Lot 156 into four lots—A, B, C, and D—excluding two remainder areas.  One remainder area consisted of two tracts of land located on either side of Schaubhut Lane behind Lots C and D—namely Lots E and F—and the other remainder area was a fifty-foot road that extended from the front of Lots A and B to the water's edge.  Mr. Flynn further confirmed that Uncle John individually acquired ownership over Lot A-7 through

_____

March 19, 2020.  In his amended petition, Uncle John asserted ownership by title and, in the alternative, by acquisitive prescription, over that portion of the waterfront property contiguous with Lot A-7.

[11] As depicted in Appendix 1, Riverlands Surveying Company's October 31, 2017 survey of the property, Lot A-7 is located adjacent to Down the Bayou Road and Bayou Des Allemands.

[12] After the conclusion of the first day of trial, the plaintiffs and Mary came to a voluntary settlement that partitioned all parts of the waterfront property, including the property east of the public road, contiguous with Lots A-7 and 1-B.  The agreement provided that the waterfront property west of the road, along the bayou, would be subdivided into five parts.  Mary would receive full ownership over the property east of the road contiguous with Lot 1-B, and one-fifth of the bayou-side property.  Pam and Jessica would each receive one-fifth of the bayou-side property in their individual capacities, and then they would also be named owners in indivision over one-half of the property contiguous with Lot A-7, as well as over another fifth of the bayou-side property.  Barbara, Michael, Richard, and Jessie would be named owners in indivision over the other half of the property contiguous with Lot A-7, as well as the remaining fifth of the bayou-side property.  At the conclusion of the second day of trial, the district court denied, with prejudice, all of Uncle John's claims, and accepted the appellees' settlement.

[13] Mr. Flynn testified that he was specifically retained to resubdivide the waterfront property into five lots, but after beginning his research, his task was altered and he was instructed to "find…the remainder of the property of Lot 156 in Coteau de France," as was sold to Willie in 1960.

the July 24, 1959 act of partition, and that Lots A-7 through A-1 were each granted "equal frontage of 71.86 [feet]" along Schaubhut Lane. Mr. Flynn testified that if the disputed tract of property contiguous with Lot A-7 was incorporated into Lot A-7, then the width of Lot A-7 along Schaubhut Lane would increase to approximately 90 feet. The 1960 act of sale sold to Willie all of the sellers' interests in the land from the water's edge of Bayou des Allemands to the water's edge of the Grand Marais, less and except Lots A, B, C, and D, as designated in the June 2, 1958 act of partition. In other words, Mr. Flynn found that Willie, as the buyer, purchased Lots E and F, as well as the fifty-foot tract of land labeled "road." He explained that neither the "road," nor Lots E and F, were partitioned in the May 23, 1958 survey or the June 15, 1958 survey.[14]

In 2017, Mr. Flynn created his survey according to where the water line was on the specific day that measurements were taken. He testified that because the public road today might not be in the same location as it was back in 1958, he could not presume to know where the water line was located in 1958. He explained that after the construction of the bulkhead, there was "really nothing [he] could do" to determine where the water line was previously located because, as of the bulkhead's construction, the water line would always be established at the bulkhead.

Mr. Flynn testified that he could not say for certain when the bulkhead was constructed. He explained that the bulkhead had not been constructed as of November 14, 1961, when the St. Charles Parish police jury resolution for the construction of the bulkhead was executed, but he assumed that it was likely constructed "sometime around that time."[15] He recognized that the resolution

---

[14] The public road, Down the Bayou Road, is located between Uncle John's property—Lot A-7—and Bayou Des Allemands. Lots E and F are located on either side of Schaubhut Lane behind Lots C and D, at the end of Lot 156, closest to the Grand Marais. See Appendix 2.

[15] The only document Mr. Flynn reviewed pertaining to the bulkhead along Bayou des Allemands was the November 14, 1961 police jury resolution; he did not review any historical documents pertaining to the actual construction of the bulkhead. The police jury resolution and attached documents were introduced and entered into evidence.

discussed "putting the bulkhead on the shoreline," but reiterated that he did not know where the shoreline was located in 1958 such that he could not know whether any erosion of the original land in front of the bulkhead had taken place since then. He later admitted that in 2017, the distance from the western boundary of Lot 1-B to the bulkhead measured over 50 feet, which likely indicates that the bulkhead was "probably not" constructed exactly at the water line in 1958.

The police jury resolution also indicated that St. Charles Parish required proper signatures for servitudes and right-of-ways from the individual owners of the land affected by the construction and maintenance of the bulkhead. Uncle John was a signatory in a document attached to the resolution, which granted St. Charles Parish a right-of-way for construction and maintenance of the bulkhead. Mr. Flynn first testified that St. Charles Parish required permission from Uncle John because the police jury resolution was executed prior to any of the partitions. However, after being reminded that the resolution was executed in 1961, conspicuously after both partitions and the act of sale, Mr. Flynn testified that he did not know why it would have been necessary for the Parish to acquire Uncle John's signature if Uncle John was not the owner of the disputed land.

Mr. Flynn testified that he went into the field to survey the property in an attempt to re-establish the boundary lines depicted in the 1958 surveys.[16] He testified that by 2017 the width of Down the Bayou Road, adjacent to Bayou Des Allemands, had diminished from 50 feet to approximately 20 feet. He explained that he then counted backwards from Lot A-1 to Lot A-7 by 71.86 feet in order to recreate the boundary lines. He testified that if he had commenced with Lot A-7 at the intersection of the southern line of Lot 156 and the public road (Down the Bayou Road) as it is currently situated, the eastern boundary of Lot A-7 would have been

---

[16] He later admitted on cross-examination that he did not personally survey the property at issue; his field workers took measurements and photographs for him, which he electronically reviewed.

through the middle of Uncle John's house. The eastern boundary lines of Lots A-6 through A-2 also would have been about 20 feet into the properties' respective residences. In measuring out the extent of the waterfront property, Mr. Flynn first located the western boundary of Lot A-7, located adjacent to Down the Bayou Road, and then "measured what was left."

Mr. Flynn developed a proposed subdivision plan of the waterfront property, considering various existing monuments and former surveys to indicate boundary lines. He testified that he was required to rely upon the measurements provided in the 1958 surveys when drawing the western boundary of Lot A-7 as "there was nothing there for [him] to rely on except the tidal distances." He later then admitted to finding a walkway on the property at issue that extended from the house on Lot A-7 to the public road, which he did not rely on in setting the western boundary of Lot A-7.

Mr. Flynn also confirmed that a 2001 survey, filed in the St. Charles Parish public records, set the western border of Lot 1-B directly adjacent to the public road, but explained that he set the western boundary of Lot 1-B some feet into the property, off of the road, where he located an old fence.[17] He testified that he also referred to a December 15, 1997 survey of Lot A, which showed Lot A-7 abutting the public road, but then within the 50 foot public road sat a 15 foot pathway, labeled "asphalt road."[18] Mr. Flynn explained that he disagreed with the depiction provided on the former 1997 survey, stating, "People get to enjoy the banks of their property. The road is not dedicated. It doesn't exist except where the asphalt is."

---

[17] Mary's title placed the western boundary of Lot 1-B at the public road. At trial, Mary testified that she intentionally placed a fence further inland on her property, rather than at the boundary line, as there was a utility pole near the edge of the road, which she did not want inside of the fenced-in portion of her front yard. Mr. Flynn also acknowledged that a gravel driveway extended from the residence on Lot 1-B up to the edge of the public road, which he did not rely upon.

[18] The 1997 survey was also introduced and entered into evidence.

Mr. Flynn testified that the June 15, 1958 survey provided a visual representation of the property description listed in the June 24, 1959 act of partition. The 1959 act of partition stated that Lot A-7 "commences at the intersection of the southern line of Lot 156 and the public road." He then testified that he could not identify where the intersection of the southern line of Lot 156 and the public road was located on the June 15, 1958 survey because he "[did]n't know where the road was at that date." Mr. Flynn explained, "the road is where the road is…There's no stated width. There's no dedication. I don't even know that a road went past this place in 1958…."

Thereafter, Mr. Flynn was asked whether he thought an individual who lived in the area in 1958 would be more apt to provide testimony regarding the 1958 location of the intersection of the southern line of Lot 156 and the public road. Mr. Flynn first responded "Perhaps…." However, after plaintiffs' objection to the testimony on the basis of speculation was overruled, Mr. Flynn changed his testimony. He then testified that he would not necessarily agree because the location of the road had not changed, and reiterated, "The road was not dedicated. It's a public way. It's not a fifty-foot right of way…"

At the conclusion of Mr. Flynn's testimony, the following members of the Schaubhut Family testified: Uncle John, Lillian, Merlin Jr., Curry, Todd, Mary, Pam, Patsy, Jessica, and Bertrand.[19]

At the time of trial, Uncle John was 88 years old; he testified that he had lived on the property located at the corner of the public road and Schaubhut Lane since he

---

[19] Uncle John—born in 1931—and Lillian—born in 1925—are the direct descendants of Arthur, and were signatories to both acts of partition and the act of sale. Merlin Jr., Curry, and Todd are second degree descendants of Arthur. Arthur's grandson and Merlin Sr.'s son, Merlin Jr., was born in 1945. Arthur's other grandchildren, Curry—born in 1952—and Todd—born in 1957—were the sons of Arthur Jr. On the other side of the family, Mary is the sole surviving child of Willie; she was 24 in 1958, at the time of partition. Pam and Patricia Schaubhut Naquin ("Patsy") are Jimmy's daughters and Willie's granddaughters. Jessica is Johnny's granddaughter and Willie's great-granddaughter. Bertrand, born in 1954, is the sole surviving child of Johnny, and is Willie's grandson and Jessica's uncle.

was born. His parents lived there before him. He testified that Arthur, his father, had passed away "about 60 years" prior, and since Arthur's death, Uncle John has always cared for and maintained his property "[a]ll the way to the asphalt road that's Down the Bayou" Road. In the past few decades, due to his age, Uncle John has acquired help in caring for his property. He testified to the following: His niece and nephew cut the grass on his behalf. His brother built the concrete steps at the road's edge on his behalf. His friend from Houma cut down some trees on his behalf. Uncle John testified that he always cut the grass and cared for the property up to the edge of Down the Bayou Road.

Uncle John testified that, over the course of his life, Willie never asserted ownership over the property contiguous with Lot A-7. Uncle John testified that Willie never told Uncle John that he owned the property contiguous with Lot A-7, nor did Willie ever cut the grass there. Uncle John also testified that he did not provide Willie notice, orally or in writing, that he was "taking back" the property contiguous with Lot A-7 because he always believed he owned the land in front of his residence.

Lillian, Uncle John's sister and the only other surviving signatory to the acts of partition and the act of sale, was 95 at the time of trial. She testified that she was also born and raised in the house located on Lot A-7 (Uncle John's house). She corroborated Uncle John's testimony. She agreed that her father, Arthur, always cut the grass and maintained the property up to the road's edge, and that after Arthur's death, which she estimated as November 24, 1951, her brother—Uncle John—took over and also maintained the property up to the road's edge. She also testified that

Willie never told her that he owned the property in front of Uncle John's residence at the road's edge.[20]

Mary, Willie's daughter, testified that Uncle John's boundary line was adjacent to the public road and, to her understanding, Uncle John owned the land all the way up to the road. She explained that while Uncle John did not have a fence, he built steps and a walkway up to the road. Though Mary never read any of the acts of partition or spoke to a lawyer about her property rights, she testified that throughout her life, before and after her father's death, she, "without a doubt…had actual knowledge" that Uncle John, and his parents before him, owned the property across Schaubhut Lane, "at least up to the road." She understood that Willie's heirs were entitled to the bayou front portion of the waterfront property (between the road's edge and the water's edge), but clarified that she did not believe that Willie's descendants owned any portion of the property contiguous with Lot A-7 (between the road's edge and Uncle John's residence). Mary testified that she only became aware that there was a question as to whether Willie's descendants owned the property contiguous with Lot A-7 when the plaintiffs approached her claiming to have proof of ownership.

Similarly, Bertrand, Willie's grandson and Johnny's son, testified that, throughout his life, it was his understanding that Uncle John owned the property contiguous with Lot A-7. Bertrand never saw his grandfather, Willie, nor his father, Johnny, maintain any of part of the property contiguous with Lot A-7.[21] Bertrand further testified that he had a close relationship with his father, Johnny, up until Johnny's death in 2015, and that Johnny never instructed him to cut the grass or

---

[20] At the conclusion of Lillian's testimony, the plaintiffs' counsel admitted to the Court that "there had been no evidence or no testimony on [behalf of the appellees] to contradict anything" stated by Lillian.

[21] On cross-examination, Bertrand testified, "it's possible" that Johnny cut the grass on the property contiguous with Lot A-7, but he found it highly unlikely. Bertrand also admitted that he has lived in Kentwood since 2016 such that it is possible that other individuals have maintained the property without his knowing.

maintain the property contiguous with Lot A-7.[22] Bertrand concluded that, to his knowledge, Uncle John still owns the property "all the way to the bayou."

Merlin Jr., Arthur's grandson and Merlin Sr.'s son, likewise testified that he was born and raised entirely in the Des Allemands area; at the time of trial, he lived less than a mile away from Uncle John. He testified that throughout his life, it had always been his understanding that Uncle John, and his parents before him, owned the property in front of Lot A-7, including the land on the bayou-side of the public road.

Similarly, Curry, Arthur's grandson and Arthur Jr.'s son, testified that his father explicitly told him that "Uncle John had the waterfront, the land by the bayou and the road and going to the back." Curry testified that he never saw Willie, or any of Willie's descendants, cut the grass or maintain the property at issue.[23] He testified that his grandparents, Arthur and Rose, lived at the property and testified that they maintained and used the property contiguous with Lot A-7, all the way to the road's edge. When Curry was a child, he and his siblings would help Arthur and Rose cut the grass and maintain the property up to the road's edge.

Merlin Jr., Curry, Todd, and Bertrand each testified that, while they never performed an independent title search or spoke to a lawyer about who owned the property contiguous with Lot A-7, it was unquestioned and common knowledge across the extended Schaubhut family that Uncle John was the owner of that property. Merlin Jr., Curry, and Todd each testified that they did not ask permission from Willie, prior to his death, and/or Willie's children, thereafter, to utilize the property contiguous with Uncle John's land; only Uncle John's permission was required.

---

[22] Mary also testified that Bertrand and Johnny "always got along," even in the final years of Johnny's life.
[23] On cross-examination, Curry testified that it was possible that on occasion someone else cut the grass on the property at issue without his knowledge.

Mary, Merlin Jr., Curry, and Todd each testified that a bulkhead was constructed in the 1960s and had moved the water line inland, pushing the road's edge closer towards Lots 1-B and A-7.[24] According to their respective statements, the location of the road was the closest it had ever been to Uncle John's house. Mary explained that in the past, the public road was a gravel road, and that the water would wash up onto the road. Merlin Jr. and Patsy both testified that there were a pile of rocks beyond the road, and then, the water line sat behind the rocks.[25] Todd went further into detail, "It was road and maybe a foot or so of gravel…then there was rock, and [after] that was the water, cut grass, and whatnot."

Curry and Todd each testified to remembering St. Charles Parish dig up the shoreline for the bulkhead. Curry explained, "The bayou kept washing closer and closer to the road" such that the Parish had to dig up at least 5 feet of land and rocks, if not more. Todd further testified that, after digging up the rocks and gravel, and the Parish moving the water line inland, the Parish had to "push the road back in order for vehicles to get around so that they could put the bulkhead down." Uncle John testified that he had to physically move the house back when the Parish widened the road.[26] Mary, Curry, Todd, and Merlin Jr. similarly testified that, while they each were too young to personally remember the house being moved, it was family knowledge that Uncle John was forced to do so.

---

[24] Mary and Patsy both estimated that the bulkhead was constructed in the early 1960s. Merlin Jr., Todd, and Bertrand testified that the bulkhead was built after Hurricane Betsy hit in 1965. Merlin Jr. helped place sandbags on the edge of the bayou in preparation for Hurricane Betsy. Todd remembered that after the storm had passed he had to move in with this aunt and uncle because the water went over the sandbags and flooded the road and bayou-adjacent properties with dead animals, fish, crabs, and mud. "It was probably a couple years after that, before Hurricane Camille hit in [19]69' that they built the bulkhead. So I know it was after Hurricane Betsy."

[25] Patsy first testified that she remembered where the water line was because she regularly walked out into the bayou, past the pile of rocks, to go swimming. However, after an objection on behalf of the plaintiffs was denied, she changed her testimony. Patsy testified that she did not know what a water line was and, after it was re-explained to her, Patsy testified that she did not know where the water line was, and that the tide "went up and down, in and out."

[26] Mary similarly testified that each time the parish comes to "re-do [the road,] they take a little bit more" of her property, making the western boundary of Lot 1-B closer to the fence.

Curry testified that after the bulkhead moved the waterline inland, many boat owners, including himself, needed to find new locations to park their boats and also needed to construct new structures to access their boat sheds.[27] Over the course of his lifetime, Curry, Arthur Jr.'s son, owned three boats, two of which he parked on the disputed land. Curry originally asked Grandma Rose whether he could park two of his boats on the disputed land, to which Grandma Rose replied: "Ask Uncle John." Curry testified that his father owned one of those boats before him and also kept the boat on Uncle John's property. Willie's sons, Johnny and Jimmy, also owned a boat shed prior to the existence of the bulkhead. Mary testified that prior to the bulkhead her brothers had a wharf to get to the boat shed, but that after the bulkhead, Jimmy needed to build a small platform, which was attached to the bulkhead, to access the wharf and boat shed.

Todd testified that he lived on the land adjacent to Lot A-7 in his house-trailer from 1979 to approximately 1983 and that he parked his car and truck there.[28] He testified that he asked the permission of Uncle John and Grandma Rose to park his house-trailer and vehicles there because they owned that land.[29] Todd testified that Schaubhut Lane was too narrow for a vehicle to pass. While living on the property at issue, he only ever accessed it via Down the Bayou Road. Further, Todd testified that Uncle John nearly always accessed his home from the public road as well.[30]

---

[27] During her testimony, Patsy also presented two photos, taken the night before trial, of a boat launch not located on Lot 156. She testified that this other boat launch was evidence of a boat launch that existed before the bulkhead on Lot 156 and which still sits directly at the water's edge.

[28] While testifying, Todd identified a photograph of a gravel parking spot located at the road's edge of Uncle John's property. The parking spot is encased by wooden logs on three sides, and opens up onto the public road on the fourth side. On the other end of the parking spot, opposite to the road, there is a concrete walkway. The image further depicts a blue truck parked at the edge of Uncle John's lawn, adjacent to the public road. A wooden boat and trailer hitch are parked on the bayou-side of the road. Todd testified that he owned the car in the gravel parking spot, the blue truck, and the boat. He testified that the walkway led from the gravel parking spot up to his house-trailer, which he kept adjacent to the driveway. The photograph was entered into evidence.

[29] On cross-examination, Todd was asked to identify where on the 1997 survey his trailer was located; Todd responded that he was not sure and admitted that it was possible that his trailer was beyond the bounds of Lot A-7.

[30] Todd testified that he only saw Uncle John use Schaubhut Lane on occasion, specifically, when Uncle John would walk the garbage up the street or go visit Todd's parents down the street.

Similarly, Uncle John testified that he used the concrete steps at the edge of the public road each time he entered or exited his property.[31]

Jessica testified that her grandfather, Johnny, has maintained the grass on the waterfront property, both on the bayou side and on Uncle John's side since the early 1990s. Johnny was a contract employee for St. Gertrude Catholic Church, down the public road from Uncle John's house. She testified that Johnny was paid to cut the grass around the cemetery and that he would always mow the grass at the road's edge of Uncle John's property in his riding lawn mower on his return from the cemetery.

Johnny never told Jessica why he was cutting the lawn adjacent to Lot A-7. Jessica testified that Johnny never told her he owned that land, and she could not say whether he was merely cutting Uncle John's grass out of the kindness of his heart. She admitted when Uncle John could not bend over to weed-eat around the poles anymore, due to his age, someone else would come and weed-eat behind him "because that's what family does." Sometimes when her grandfather would cut the grass by Uncle John, he would just cut the whole yard for Uncle John—"all around his house, adjacent to his house, and everything."

When Johnny became physically incapable of cutting the grass, due to his age, Jessica testified that she took over, with the help of her husband, her son, and Pam's husband. Jessica testified that after Johnny's death in 2015, her family was "cursed

---

[31] The images entered into evidence indicate that there are two sets of concrete steps. There are some concrete steps abutting the house on Lot A-7 and there are some other concrete steps at the road's edge. The testimony indicates that both sets of steps, and the concrete walkway leading from the steps abutting Uncle John's house to the steps abutting the road were constructed together. Pam testified that prior to 1997 the steps were made of wood; she believed that the concrete steps were not built until 1997 when a Robert Duvall movie was filmed at Uncle John's house. Merlin Jr., Curry, and Todd testified that the steps were never made of wood. Merlin Jr. testified that the steps abutting Uncle John's home were never made of wood and that his father, Merlin Sr., built those steps out of cement on behalf of Uncle John and Grandma Rose around 1960 after the house was moved back, to aid Grandma Rose in crossing the property and walking up the levee. Curry also testified that the road was never on the other side of the steps because, before the bulkhead was built, Merlin Sr. used to park his car at the steps to go catfishing. And Todd testified that the steps were made out of concrete and adamantly believed that "if someone said that the steps didn't come in until after 1997," that person would be incorrect. The concrete steps were there at the time he was living on the adjacent property, and beyond that, as far back as Todd could remember.

out" and "screamed at" by Mary and Faith each time they tried to cut the grass.[32] Jessica called the police and took photos of the harassment that she and her family endured.[33] Jessica stated that her original purpose in filing suit was to stake a claim over the property adjacent to Lot 1-B, "and this wouldn't even be going on if Faith and Mary wouldn't have tried to steal from all their other siblings." Accordingly, Jessica only cut the grass and maintained the waterfront property on the bayou-side property and the property contiguous with Lot 1-B.

Jessica testified that prior to 2017 she did not know she had any potential ownership interest in the property contiguous with Lot A-7 because Uncle John had maintained and used that property for more than thirty years and had lived there all his life. "Once we had [the land] surveyed [in approximately 2017[34]], we knew where the line was" and began cutting the grass on the property at issue. However, Jessica testified that "every time we tried to go up there and do anything," including cutting the grass, her family was harassed. Jessica testified that after she learned of her potential ownership interest in the property contiguous with Lot A-7, she was told "by someone else, that [Willie], once he bought it, still gave [Uncle John] permission to keep using it for the time being." After Willie passed, that same person told her that Uncle John uses the property contiguous with Lot A-7 with the permission of her great-grandfather Willie, and his children, Johnny (her grandfather), Jimmy, and Lloyd.

---

[32] At that time, Mary owned Lot 1-B abutting the public road (parallel to Lot A-7).

[33] Jessica's photographs were admitted into evidence. Two of the photos were taken on May 17, 2016 and the other two were taken at some point between 2017 and trial. Though Jessica did not yet know of her ownership interest in the property contiguous with Lot A-7, her son Dylan mowed the entire tract of disputed land east of the public road, including the property contiguous with Lot A-7 on May 17, 2016. On cross-examination, she explained that she did not take those photos to interrupt Uncle John's possession, but because she wanted to document the harassment she was enduring.

[34] Jessica testified that she was unaware of any potential ownership interest in the property at issue until at least 2017 and also testified that she remained uninformed of any potential ownership interest until the property had been surveyed. Mr. Flynn testified that he was specifically hired to resubdivide the waterfront property into five lots and that his proposal was not completed until 2019. The testimony does not indicate when, between 2017 and 2019, Jessica learned of her potential ownership interest in the property at issue.

At the conclusion of trial, the trial court rendered a judgment in favor of the appellees, finding that Uncle John failed to meet his burden of proof by a preponderance of the evidence, and dismissing, with prejudice, all of Uncle John's claims. The trial court found that the property at issue was not included within Lot A-7 and, thus, had been sold to Willie pursuant to the 1960 act of sale, stating from the bench that Uncle John's "possession was not of a sufficient nature to acquire ownership from his vendees by prescription." On July 17, 2020, the trial court issued a judgment consistent with his previous findings, stating "…for the reasons recited on the record at the conclusion of the trial on June 29, 2020, upon finding that…[Uncle] John Schaubhut, as the Petitioner in Intervention, has failed to meet his burden of proof of a preponderance of the evidence,…this Court denies with prejudice the claims of [Uncle] John Schaubhut to a right of possession over and/or the actual ownership of any portion of the remainder of Lot 156 conveyed to [Willie] Schaubhut pursuant to that Cash Sale dated April 18, 1960…" The trial court also enacted the appellees' voluntary settlement as read into the record on the first day of trial.

Uncle John appeals the trial court's judgment, contending first that he owns the property at issue pursuant to his title and that the trial court committed legal error in setting the western boundary of Lot A-7 fifty feet from the bayou's edge, rather than at the edge of the current location of the road.[35] Alternatively, Uncle John contends that the trial court erred in finding that he failed to meet his burden to prove that he acquired the property at issue, contiguous with Lot A-7, pursuant to acquisitive prescription.

---

[35] As mentioned, the only portion of the waterfront property currently in dispute is the immovable property contiguous with Lot A-7, in front of Uncle John's residence and adjacent to Down the Bayou Road.

# DISCUSSION

The Louisiana Civil Code sets forth the standard used to judicially fix a boundary between contiguous properties when the parties cannot reach an agreement. La. C.C. art. 792 provides that the court shall fix the boundary according to the ownership of the parties. To prove ownership, parties may rely on their titles or acquisitive prescription. La. C.C. arts. 793-94. If both parties rely on titles only, the boundary shall be fixed according to titles. When the parties trace their titles to a common author, preference shall be given to the more ancient title. La. C.C. art. 793. If neither party proves ownership over the disputed property, the boundary shall be fixed according to limits established by possession. La. C.C. art. 792. La. C.C.P. art. 3693 provides that "[a]fter considering the evidence, including the testimony and exhibits of a surveyor or other expert appointed by the court or by a party, the court shall render judgment fixing the boundary between the contiguous lands in accordance with the ownership or possession of the parties."

The appellees contend that the 1960 act of sale to Willie included the land on which the fifty-foot road was located in 1960 and that, as a result, they are entitled to ownership over fifty feet of land from the bayou's edge. On the other hand, Uncle John contends that the 1960 act of sale reserved all immovable property assigned to him pursuant to the June 2, 1958 act of partition.[36] He asserts that the clear language of the partition stated that Lot A-7 commences at the road's edge, not fifty feet from the bayou. He contends that, at some point in the late 1960s, St. Charles Parish built a bulkhead on Bayou des Allemands, and in doing so altered the location of the shoreline such that fifty feet from the bayou's edge today is not the same as fifty feet

---

[36] The four corners of the 1960 act of sale executed the sale of all the land inherited pursuant to the 1958 act of partition, with the clear and unambiguous exception of any and all property assigned in the June 2, 1958 act of partition. Uncle John asserts that "nothing about [the July 24, 1959 act of partition] changed the description of the 'less and except'" property left over from the June 2, 1958 act of partition, such that the identification of Lot A-7's western boundary terminates any inquiry into whether Willie's descendants have an ownership interest in the property contiguous with Lot A-7.

from the bayou's edge in 1960. Uncle John further argues that neither he, nor Willie, nor any other signatory to the 1960 act of sale intended for the act of sale to impact his property rights because they all understood that Lot A-7 commenced at the road's edge, regardless of where the road's edge was located. In the alternative, Uncle John asserts ownership over the disputed tract of property contiguous with Lot A-7 through acquisitive prescription.

Upon review of the record, we find that the trial court erred in its determination that Uncle John failed to prove that he acquired the property at issue through thirty-year acquisitive prescription. Because we find that the record establishes that Uncle John met his burden to prove ownership of the property at issue, contiguous with lot A-7, through thirty-year acquisitive prescription, we pretermit discussion of Uncle John's remaining assignments of error. Accordingly, for the reasons discussed below, we reverse the trial court's July 17, 2020 judgment in part and remand for the trial court to amend the judgment to specify that Uncle John is the owner of the property at issue through thirty-year acquisitive prescription.[37]

**Acquisitive Prescription**

Acquisitive prescription is the "acquiring of ownership or other real rights by possession for a period of time." La. C.C. art. 3446. Ownership of immovable property by acquisitive prescription may be acquired by either ten years of possession or thirty years of possession. La. C.C. arts. 3473, 3486. To acquire ownership with ten years of possession, there must be possession for ten years, good faith, just title, and a thing susceptible of acquisition by prescription. La. C.C. art. 3475. Ownership and other real rights in an immovable may be acquired by the

---

[37] Uncle John further contends on appeal that the trial court committed legal error in "applying an incorrect burden of proof in [his] argument of acquisitive prescription, particularly, to the extent It [sic] considered [Uncle John] as being a precarious possessor." There is no evidence in the record that the trial court made any factual determination that Uncle John was a precarious possessor. Therefore, we find no legal error and this assignment lacks merit.

prescription of thirty years without the need of just title or possession in good faith. La. C.C. art. 3486.

To acquire possession of property, one must take corporeal possession with intent to possess as owner. One is presumed to intend to possess as owner unless he began to possess in the name of and for another. La. C.C. art. 3427. Corporeal possession is achieved through the exercise of physical acts of use, detention, or enjoyment over a thing. La. Civ. Code art. 3425. The possession must be continuous, uninterrupted, peaceable, public, and unequivocal. *Chauvin*, 231 So.3d at 910. The burden of proof for acquisitive prescription is by a preponderance of the evidence. *Carnaggio v. Cambre*, 11-552 (La. App. 5 Cir. 12/13/11), 84 So.3d 631, 639. Proof by a preponderance of the evidence is defined as taking the evidence as a whole, the fact to be proved is more probable than not. *Boxie v. Smith-Ruffin*, 07-264 (La. App. 5 Cir. 02/6/08), 979 So.2d 539, 545.

Recently, in *Horaist v. Pratt*, 21-166 (La. 03/23/21), 312 So.3d 1093, the Louisiana Supreme Court considered the elements necessary to sufficiently prove ownership of property through acquisitive prescription. At issue, in that case, was the ownership of a strip of land running along the backyard boundary between Lot 229, owned by Ms. Horaist, and Lot 234, owned by the Pratts, in the Live Oak Park Subdivision located in Lafayette, Louisiana. The Court stated:

> The trial court correctly found the Pratts acquired ownership of the disputed land through thirty-year acquisitive prescription. When the Pratts purchased their lot in 1977 a visual boundary existed, which they believed to be the property line. They began exercising possession up to this visible boundary beginning in September 1977. According to testimony, they placed swings, parked boats, and maintained the yard in this area since 1977. They constructed a wrought iron fence along a portion of the boundary and later constructed a wooden fence along the entire boundary line. The Pratts' possession began in 1977, and it was never questioned until Deborah Horaist purchased her lot in 2014. The trial court correctly set the boundary along the existing wooden fence as the Pratts had acquired ownership of the land by thirty-year acquisitive prescription in 2007.

Applying the Louisiana Supreme Court's analysis in *Horaist, supra*, to the instant case, we find that the trial court was manifestly erroneous in finding that Uncle John failed to meet his burden to prove by a preponderance of the evidence that he acquired the property at issue via thirty-year acquisitive prescription.[38]

First, the immovable property at issue, as a private thing, is susceptible of acquisition by prescription. La. C.C. art. 3485 ("All private things are susceptible of prescription unless prescription is excluded by legislation."); La. C.C. art. 453 ("Private things are owned by individuals, other private persons, and by the state or its political subdivisions in their capacity as private persons."); *Chauvin*, 231 So.3d at 910-11.

Second, the record reflects that Uncle John has possessed the property as owner up to the road's edge for a period of more than thirty years. Possession is the detention or enjoyment of a corporeal thing, movable or immovable, that one holds or exercises on his own behalf or by another who keeps or exercises it in his name. La. C.C. art. 3421. To acquire possession, one must intend to possess as owner and must take corporeal possession of the thing. La. C.C. art. 3424.

When Arthur's seven children, including Uncle John, acquired Lot A through the June 2, 1958 act of partition, a visual boundary existed—the road—which they believed to be the property line pursuant to the clear and unambiguous language of the act of partition.[39] *See Horaist,* 312 So.3d 1093. Uncle John and his co-owners immediately began exercising possession up to this visible boundary.[40] Thereafter,

---

[38] There is an argument to be made that Uncle John satisfies the requirements for ten-year acquisitive prescription where he has possession of ten years, and a thing susceptible of acquisition by prescription. However, the 1960 act of sale could reasonably call into question whether or not Uncle John had good faith and a just title. Although the trial court did not provide reasons for its findings, because we are viewing the record under the manifest error standard of review and the 1960 act of sale could reasonably preclude ten-year acquisitive prescription, we will apply thirty-year acquisitive prescription.

[39] The act of partition stated, "Lot A commences **at the intersection of the Southern line** of Lot 156 with the public road running along Bayou des Allemands." (Emphasis added).

[40] We further point out that it is undisputed that Uncle John's parents owned his house and land before him. It is also undisputed that Uncle John and Lillian were born and raised at the house currently located on Lot A-7, in which case, Uncle John's family has been possessing the land up to the road's visible boundary—

upon acquiring Lot A-7 through the July 24, 1959 act of partition, Uncle John continued exercising possession as owner up to this visible boundary. He exercised possession as owner up to the visible boundary line through the 1960 Act of Sale, through the building of the bulkhead, and through the re-structuring and paving of the road.

We find that between the act of sale in 1960 and Jessica's discovery of her ownership interest between 2017 and 2019, Uncle John continued exercising possession as owner over all of the property contiguous with Lot A-7 up to the visible boundary of the road's edge.[41] This leaves Uncle John with approximately fifty-seven years of possession that was uninterrupted, peaceable, public, unequivocal, corporeal, and continuous.

The record reflects that Uncle John's possession was uninterrupted as there is no evidence indicating that he ever lost possession. La. C.C. art. 3465. Possession is lost when the possessor manifests his intention to abandon it or when he is evicted by another by force or usurpation. La. C.C. art. 3433. There is no evidence that Uncle John manifested an intention to abandon the property between 1960 and 2017 and there is no evidence Willie ever asserted ownership over the disputed land. To the contrary, after the execution of the 1960 act of sale, Uncle John and Willie both signed a document for St. Charles Parish, the November 14, 1961 police jury resolution, respectively asserting their ownership interests in the land all the way up to the water line. Additionally, Willie passed away four years after the act of sale was executed and Mary, his sole living child, testified that throughout her life she had actual knowledge that Uncle John and his parents owned the disputed property

_____

though that boundary line may have been at alternate locations—since Lillian was born in 1925. *See* La. C.C. arts. 794, 3442 (allowing a party to tack onto the possession of its ancestor in title if the possession occurs without interruption).

[41] There is no testimony in the record to indicate that the location of the road's edge has changed or moved in the thirty years prior to 2017, the earliest time at which Jessica discovered her potential ownership interest.

"at least up to the road."

Merlin Jr., Curry, Todd, Bertrand, Lillian, and Mary, each of whom were born and raised in Des Allemands, respectively testified that Uncle John owned and maintained the property at issue and no one other than Uncle John, or certain individuals on Uncle John's behalf, cut the grass or otherwise cared for the property at issue. *See* La. C.C. arts. 3421, 3424. By Jessica's admission, Uncle John's possession was never questioned until she learned of her ownership interest in the property. Jessica testified that, prior to at least 2017, she did not know she had any potential ownership interest in the property at issue and acknowledged that Uncle John had maintained and used that property for over thirty years and had lived there all his life. *See Horaist*, 312 So.3d 1093.

Further, the record reflects that several relatives used the property at issue, but solely with Uncle John's permission. The testimony at trial establishes that, over several decades, Merlin Jr. parked his boat on the disputed property, Curry kept two boats there, Curry's brother-in-law kept a boat there, Curry's father, Arthur Jr., kept a boat there, Merlin Sr. kept a boat there, and Todd parked his car, his truck and his house-trailer on the disputed property. *See* La. C.C. art. 3421. Each of these parties testified that they utilized the property at issue only with Uncle John's permission.

We are cognizant of Jessica's testimony that Johnny, her grandfather, occasionally cut the grass on the property contiguous with Lot A-7 "because that's what family does." However, "[u]nder the Civil Code, possession is not interrupted when it is merely disturbed. A possessor does not lose possession against his consent unless he is forcibly expelled or unless the disturber usurps possession and holds it for more than a year." *Liner v. La. Land & Expl. Co.*, 319 So.2d 766, 778 (La. 06/23/75), *reh'g denied*, (La. 09/25/75).[42] Furthermore, Jessica admitted on cross-

---

[42] Further, it remains unclear whether Johnny's mowing of the lawn rises to the level of a disturbance or whether Johnny's mowing of the lawn constituted possession on behalf of another. *See* La. C.C. arts. 3421,

examination that she did not have any evidence to indicate that Uncle John's possession was ever interrupted beyond the four photographs she took between 2016 and 2019 (more than thirty years after the 1960 act of sale), which depict the plaintiffs cutting the grass between the public road and the bayou, on the property in front of the residence at Lot 1-B, and near the property currently at issue.

Uncle John's possession was peaceable between 1960 and 2017 because there is no evidence in the record to suggest that his possession was acquired with or maintained with violence. *See* La. C.C. art. 3436. His possession was open and public having been made conspicuous with routine maintenance and public enjoyment. *See* La. C.C. art. 3436. His possession has been unequivocal due to the clarity of his intent to own the property. *See id.* ("[Possession is] equivocal when there is ambiguity as to the intent of the possessor to own the thing."). And, lastly, we find that Uncle John's possession was corporeal and continuous. *See* La. C.C. arts. 3425, 3443, 3436. There is simply no evidence in the record to rebut the testimony of multiple witness, including the lead plaintiff Jessica, that Uncle John enjoyed uninterrupted, peaceable, public, unequivocal, corporeal, and continuous possession of the property as an owner for over fifty years, until that ownership was questioned no earlier than 2017.

The Louisiana Civil Code clearly provides that when a party proves acquisitive prescription, the boundary shall be fixed according to limits established by prescription rather than titles. La. C.C. art. 794. And, "[i]f a party and his ancestors in title possessed for thirty years without interruption, within visible bounds, more land than their title called for, the boundary *shall* be fixed along these bounds." La. C.C. art. 794 (emphasis added); *see also Horaist*, 312 So.3d 1093 (A

---

3424. Jessica testified that when Uncle John was no longer fit to maintain the yard on his own, that her grandfather would come and maintain the yard behind him "because that's what family does." Johnny never told Jessica that he owned that land, nor did he explain why he was cutting that grass.

possessor may occupy up to an existing boundary and prescribe on the land possessed.) Thus, even if the land adjacent to the current location of the road that is contiguous with Lot A-7 is beyond the limits of Uncle John's title pursuant to the 1960 act of sale, we find that Uncle John's ownership of this property has been established by thirty-year acquisitive prescription.

We find that the record clearly establishes Uncle John's intent to possess as owner the property at issue and that his possession was continuous and uninterrupted, peaceable, public and unequivocal for at least thirty years. La. C.C. arts. 3424, 3425, 3436, 3443, 3476; *Carnaggio*, 84 So.3d at 639. We therefore conclude that the trial court manifestly erred in finding that Uncle John failed to meet his burden to prove ownership over the property at issue through acquisitive prescription and in setting the boundary in conformity with the measurements set forth in the 2017 Riverlands survey. Because Uncle John successfully proved that he possessed, for thirty years without interruption, the property contiguous with his land within the visible bound of the road, the boundary must be fixed along the visible boundary. La. C.C. art. 794; *see also Horaist*, 312 So.3d 1093. Therefore, after considering the evidence, we render judgment fixing the boundary between the land owned by the appellees and Uncle John along the public road's edge, as it is currently located.

**DECREE**

Based on the foregoing, we reverse the trial court's July 17, 2020 judgment in part and remand for the trial court to amend the judgment to specify that Uncle John is the owner of the property at issue through acquisitive prescription of thirty years and that the boundary of Uncle John's property is set along the public road.

**REVERSED IN PART AND REMANDED TO AMEND JUDGMENT AS INSTRUCTED**

Appendix 1:



Appendix 2 - June 15, 1958 survey:



SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

NANCY F. VEGA
CHIEF DEPUTY CLERK

SUSAN S. BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**JULY 21, 2021** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT
REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

**20-CA-371**

**E-NOTIFIED**
29TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE TIMOTHY S. MARCEL (DISTRICT JUDGE)
LOUIS G. AUTHEMENT (APPELLEE)          RUSSELL C. MONROE (APPELLANT)          DAVID S. MOYER (APPELLEE)

**MAILED**
NO ATTORNEYS WERE MAILED